Someone from the legislative session will take question at this time. Your Honor, two very long briefs, I think the court's probably aware of that, with extensions of course, and I have briefed every issue in this case, so I'm not by these Presidents waiving any of the issues in the brief, but because of the shortness of time, that's totally not related to how much time I put into this, but nevertheless, I'm going to present three issues today, Your Honor, assuming we get to the third. The first two are Supreme Court, recent Supreme Court binding authority, U.S. v. Simonelli and Thompson v. the United States, or U.S. v. Thompson. Both were post-conviction Supreme Court decisions that bear directly on this case, and the conviction and jury charges and everything about this case, it's ever pervasive throughout, as I said in my brief. And then the third issue I'd like to present, time permitting, is the privilege violation where my memos and communication between my client became part of the government's production, government's discovery, and was disseminated to the prosecution team and without any opportunity under Harbor, which is your authority, to be involved at that early stage. I hope I get there, but that may be a separate situation altogether. And I'd like to bring up, Judge, at the beginning, as the backdrop, might be the few cases that I've read, maybe that you've had. In this case, we have absolutely no bribery, no kickbacks, no theft, all the books and records were intact in the bank, no manipulation, no obstruction, full disclosure in all books and records, disclosure to the FDIC and the Board of Directors. So that all the loans that are the subject of this, all seven loans, every shred of evidence is contained in the books and records of the bank. For all to see, FDIC had full exposure to them, and all of them were disclosed to the FDIC and in every FDIC report. I will not be able to get to a loan-by-loan examination. I don't know if the government's going to do that or not, as it did in its brief. And you'll find that there was no self-dealing here. The only benefit that Mr. Ryan had for all of his actions was his board-approved salary, compensation, and benefits. I thought he was a co-investor with one of the fellows who got the benefit of one of these loan, what do you call it, kiting? It's not exactly kiting. What do you call it? Well, there was overdraft lending that the FDIC said, and I quoted it in a recorded meeting, saying that loans for loans and overdraft lending in lieu of just usual credit, credit line, line of credit, is not prohibited. So that the fact, it's not a kite because it's not illegal. And it may be against, and as the FDIC told Mr. Ryan, it's not prohibited, but it's not best practices. Well, under CRISTO, but you know, Your Honor, he was not, there was no investor of his except Mr. Treme and Ashton Ryan recused himself from all of those votes, and that was Mr. Hebe, Mr. Beebe, was the loan officer, and he was acquitted. So, I think that it might be a mischaracterization. I can understand through the volume that you've gone through, but yes, Mr. Treme, one of the seven, did make loans, but Ashton Ryan did not approve those loans. I see. So, and that's all according to the record. Okay. Didn't he take the proceeds from a loan to Mr. Treme and give it to, money that was supposed to be used to forgive the venture's debt, that he was a partner with Mr. Treme, and to another person and to Mr. Treme? Well, I wish it were that simple, but it was that this contractor who had worked for Mr. Ryan on a real estate, separate real estate project, the Wadsworth project that was being The foreman of it was Mr. Treme, and he was paid whenever he would make his loans and he did his work. Well, the money ran out, and he continued to work under an agreement for open account. And so, when he would continue to make loans with his accounts receivable, and it was disclosed that Mr. Ryan's companies were debtors to him. And Mr. Ryan did make loans to him while he was working for Mr. Ryan. That is correct. That's a conflict of interest. And Mr. Ryan admitted that it was a conflict of interest. And whether he should have recused himself is not an issue in this case. And under U.S. v. McWright, which I cited, conflict of interest, rego violations are not criminal under federal law. That's not, and it goes back to Riddle, which I also cited, saying that negligent lending, self-dealing lending, conflict of interest, they say maladministration of loans, poor judgment, poor lending authority, making mistakes is not a violation of federal law. That's Riddle, and it's very close in fact to the present case. And then McWright, similarly, inciting Christo, said conflict of interest is not a crime, not a federal crime. So that even if it was as simple as Your Honor said, and that Mr. Ryan benefited from a loan, one of two things happened. It could be a rego violation, which isn't criminal, and it could also be a conflict of interest. I'm repeating myself. So that that would not be a crime. So is there any more question on that, Your Honor? Okay. I think, I hope I've answered it. So that if we go ahead now to Simonelli, which was post-verdict, 5-1-23, the verdict was in February of 23. And this said, stated, and it's a unanimous decision by the United States Supreme Court, which said, where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions, that is not a violation of federal law. That's on property. So the whole thing with Simonelli, it's in a long line. We went from McNally, it's great Supreme Court history, but we went from McNally to Cleveland to Skilling, and in each instance, when the Supreme Court had the opportunity, it would rein in the jurisdiction of the government and say, that's not property. And the bottom line is, intangible rights are not property to this day, even with honest services under Skilling, which must be bribed or kicked back. So what Simonelli did, it reasserted the authority of those cases and gave the same history lesson. And said, this is nothing more than intangible rights. You're depriving... What's the intangible right here? What you have here is falsifying bank records so that people who cannot afford to repay get more and more and more money. Heck, I'd have taken some loans on that basis. Well, no, Your Honor, then maybe Congress has to act. But what it says here is that if an employee, bank officer, president, CEO, as Mr. Ryan, if he gives a false statement that is not correct information and deprives the board of the ability to manage its assets, its money, meaning its loans, that is not a violation of federal law, because that is an intangible right to control the assets. And William Aron testified at length on that at trial, that the bank board manages the loans at the end of the day, and that's money. And what Judge Fallon said was, well, Simonelli doesn't apply because Simonelli involved just information and not money, loans. Well, Simonelli involved $750 million contract that was obtained by Mr. Simonelli by providing false information to the contracting agency and getting a contract that he wasn't entitled to get. So it's the same thing that you just said. You're providing false information, and they can't manage the loans. They can't manage their property. Your bottom line is saying, I mean, I read your brief, and I read a lot of the record as well. You're arguing what your client was convicted of wasn't a crime. Is that your bottom line? Not a federal crime. Well, so I mean a federal crime. Yeah, it's not property under 1344 bank fraud. I know that's your argument, and that you've been consistent with that. Yeah. But I mean, within all of that and giving us the Supreme Court history, that's the argument you've made, is that what your client did at best was civil, maybe bad judgments, et cetera, et cetera. Exactly. And it wasn't a crime. And that's what you argued below, and that's when you argued your motion to acquittal, and that's what you argued to the jury, and on, and here we are. Mm-hmm. Thank you for recognizing that, because that's absolutely correct. And I think we could think back when people were saying the same thing about honest services to skilling. Wait a minute. You cooked the books of Enron and self-dealt so that you could get benefits here and benefits there. Back up here. Are you saying that the use of the bank's money going to otherwise insolvent borrowers, the deprivation of that money, you're saying that's not cognizable as a crime? You're analogizing that to skilling? Absolutely. Because look what skilling did. He did the same thing. He inflated the books and records of Enron for his own personal gain, self-dealing. The Supreme Court said that's not a crime unless he gets a bribe or a kickback. All right. You've argued Seminelli. We've read it. What's your best other case that says what was charged here under 13441 is not a crime? Well, it doesn't get any better than Seminelli. Well, you keep saying it just because you say it doesn't make it so. You're an eloquent, very skilled lawyer. And you made this argument below. And I'm not trying to move you off of it. It's just if that's what you want to say, skilling, we read it. Then I'm just asking what else besides skilling? Well, skilling on this point, not, you know, we've had lots of these kinds of cases, but they're all different. And in this case, essentially, you don't want the government charged. I just wanted to make sure I wasn't missing the argument. No, Judge, I think you got it right. And every one of these cases are very fact-specific. It's hard to find the transaction. But the false statements throughout the indictment, if you read every substantive act, the false statements are Ashton Ryan giving an opinion or a memorandum to the board assessing a loan, information that he obtained from these underwater borrowers. And they were all based on pro formas and what was expected to happen in the future. And his famous statement was, they're all performing as agreed. Well, they were performing because they were getting more loans, which is literally true. What's that? I'm sorry. Because of his side deals, whatever those might have been. There's no side deal. Well, I'm saying the whole thing were side deals because they couldn't perform. And he's telling the law. But I have this question. Seminelli is a wire fraud case, using the wires to defraud. Seminelli was bank fraud. Well, maybe. Yeah. 1343, was it? Oh, 1343, yeah. Wire fraud. Yeah. 1343. But the Supreme Court said all the 1341 et sec. They all applied it. This is 1344 one. The elements are bank fraud, a scheme or artifice to defraud. So isn't that broader than defraud? Well, the Supreme Court said that was the government's position. Because the or is used, the disjunctive. The government tried to say, well, that applies to intangible rights. But the Supreme Court said, no, it's got to be property, traditional property rights. Now, Congress can cure this, but it has not. And not in the last two years that I know of. But it has to be securities, money, real estate, or other assets. Traditional notions of property. That's what all of these cases say. And anything intangible is not property in here. Let's assume for the sake of 55 seconds that we got your point on that. Where are you? Otherwise, this is a long trial. I've read a lot of it. It went on for days. Your client testified. The government went on and on and on with exhibits. The whole schmeal. So moving away from your baseline argument, I'm just asking, fighting that for the moment, what else? Well, the next topic I would bring up, and I'd like to correct something Judge Jones when he said he had something going on the side. There was no side, off book loans, no side deals. There was a conflict of interest that he owned up to, but that is not a crime, a federal crime. So what else, your honors? Well, Simonelli takes us in a lot of different directions, but the next would be Thompson on false statements under 1005. And 1014, it was a 1014 case, but the same thing as a 1005. And what Thompson said was, it has to be literally, it has to be false. And it cannot be misleading. And if it's false and misleading, then it's a false statement for purposes of 1005. But if it's literally true but misleading, it's not a federal crime. It's not a false statement. And every statement, we don't have time for me to go through them here. I listed them in the brief. Every time there was, well, to go back a second, Judge Stewart, in my brief, I'm sure you're aware, I gave a list of the items in the government's brief where they describe to a T what Simonelli is. And what they're saying is, that's what Ashton Ryan did. Simonelli ruled that out. I really don't have to go beyond Simonelli, but we could go back to the whole history of the Supreme Court from McNally to the present and come up to the same result. It can't be intangible. Now, with the 1005, if any statement is literally true, again, let me make another correction. There was no jury charge. We have to go to the jury charge under Simonelli. And all the district court did was give a pattern instruction on property. Didn't define it. Didn't limit it. It just said property. And it was a general verdict. So we don't know what the jury did. We don't try to tell counsel, especially able ones like you, how to use your time. I know. I'm out. We're really trying to move you off skilling so you can have time for something else. Well, I'll give you one more minute. Well, I would go immediately to— You're already over, so— I would go immediately—thank you. I still hope I have my five-minute rebuttal. But I'd go immediately to Thompson, which stated that it can't be misleading. And we went back and did a word search and produced in the brief every time the prosecutor asked a witness if something was misleading, which is not a violation. The jury hears that and says, well, when the witness says, yes, it was misleading, the government's saying, aha, that's a violation of the law. Not under Thompson. But the jury wasn't instructed that it can't just be misleading. It has to be false. It gave the same pattern jury charge that Thompson did. And I submitted that last week in my 28-J letter to show you what the jury charge was in Thompson. And there's no jury charge to correct and help the jury. And it's a general verdict. I would ask this panel, from everything you've read, Judge Stewart, how do you know what the jury did? What did the jury select? Did the jury say, I'm convicting under 1344 for improper information, for the right to control or some hard property or intangible right? Thank you, sir. Thank you. All right. You have time for a vote. I would not seize on your rhetorical question. A nice try, but I'm not. I'd really be interested to hear your answer. I'm sure you would. Thank you. Mr. Moses. Good afternoon, Your Honors. May it please the Court. Nicholas Moses, along with Matthew Payne and Ryan McLaren, on behalf of the government, we were all trial counsel, Your Honor. This is a simple case with a very standard example, traditional bank fraud. This Court has many examples of these facts going back in its case law throughout as far back as the 1990s from the savings and loan cases. It involves a banker who had bad loans where the borrowers couldn't pay. And the banker conspired with the borrowers to pay those bad loans with new bad loans. And then they all lied to the bank and falsified documents in order to cover up what they had done. Nothing about these very normal versions of these bank fraud facts changes in light of the Supreme Court's more recent opinions in Simonelli or in Thompson. The Court obviously understands Simonelli. I won't spend much time on it. This case was not presented under the right to control theory. That is a unique theory that used to exist in the Second Circuit that applied to wire fraud cases. Here, this was presented as a traditional bank fraud case where the bankers defrauded the bank in order to obtain its money here to get the loan proceeds that was given to the borrowers. While Ashton and Ryan argued at trial, both on the stand and through counsel, that there was reflected in the jury verdict. Several of the borrowers who testified at trial, and that includes all seven of the borrowers in the indictment who testified at trial, but several of them personally explained their role in kickback schemes with Ashton and Ryan. Jeffrey Dunlap, who is the subject of several substantive counts, was Mr. Ryan's contractor. He was doing work on a project called Wadsworth on the north shore of Lake Pontchartrain for Mr. Ryan and Warren Tremay, and Mr. Ryan wasn't paying his contractor. The contractor was being paid through bank loans. It wasn't just the contractor himself who said that. It was also Bill Burnell, who was the chief credit officer of the bank. He pled guilty to his own role in the bank fraud conspiracy, and he said the same thing. Mr. Dunlap was being paid through loan proceeds. Warren Tremay also pled guilty to conspiring with Ashton and Ryan in the Wadsworth project, getting money from the bank, both for personal expenses and to pay for their joint project, even though he couldn't actually pay those loans. And Arvin Mike Vera was a third borrower who testified at trial about his side deals with Ashton and Ryan, and how he and Ashton and Ryan agreed that they would hide some of those side deals from the bank and its board of directors. But a kickback scheme wasn't necessary here, because this was a very traditional case of bank fraud, where the object was the money and property of the bank, and that's why Judge Fallon was correct that there was no need to consider Simonelli here under these facts. The same is true of Thompson. Thompson does not affect the bank fraud counts here at all. Thompson was limited to false statements under a different statute, 1014, and even Thompson on its own terms had no bearing on the fraud statutes, neither bank fraud nor wire fraud. Thompson was only limited to the false statement language in 1014, which is fairly similar to the false entry language in 1005 here. But Thompson does not affect any of the false statement verdicts in this case. The jury here heard from people involved in all of the charged false statements, and while there are eight of them, they really fall into two buckets. Three of the false statement counts here involved a borrower, Kenneth Charity, and the false statements were Ashton and Ryan writing in bank records that Kenneth Charity needed more time on his loan because his CPA had resigned due to overwork. The jury heard from Mr. Charity, who pled guilty to being in the fraud scheme with Ashton and Ryan. The jury heard from the CPA, and the jury heard from Ashton and Ryan, and the CPA testified that he resigned because Mr. Charity could not provide documents to substantiate his finances. He was impossible to work with. He never followed up with anything. And then the CPA told the jury that he conveyed all of that to Ashton and Ryan before he made the false statement. He was subject to cross-examination, and Ashton and Ryan was able to testify, and the jury didn't believe Ashton and Ryan's defenses. There was nothing wrong with the jury instructions in those counts. The jury was instructed that it was a crime to knowingly make a false statement in a bank record, and that's what they convicted Mr. Ryan on, on the three Kenneth Charity counts. The remaining false statement counts all involved a single borrower, Gary Gibbs, and a single type of document. It was a criticized asset action plan. As Thompson explained in the 1014 context, in evaluating a statement's falsity, the key is to look at that statement in context. In Thompson, the statement was, I only borrowed $110,000, and the context was, you owe the bank over $260,000. There was no problem with the jury instructions in Thompson. Instead, the Supreme Court remanded because the Seventh Circuit incorrectly conflated misleading with false in their evaluation of the false statement counts. That's why Justice Jackson suggested there was nothing to do on remand but affirm. Regardless of what the Seventh Circuit does on remand, the Thompson majority opinion made clear that context is key, and it noted at the final paragraph of that opinion that if the question had been, did you borrow $269,000, and Mr. Thompson had said, I only borrowed $110,000, that would have been false. It would have been false and misleading. The context is even stronger in this case. First, the statute adds its own context. Section 1014 is the crime of making any false statement in connection with a loan. 1005 is the crime of making a false entry by a bank officer or employee in a bank record. So already the context is someone who works at the bank filling out a record in the bank. But here, there was much more context than that. An FDIC examiner, Tim Strain, testified at trial that the FDIC forced the bankers to use these documents, the Criticized Asset Action Plans, because the bankers needed to report to the Board of Directors how things were going on these problem credits, like Mr. Gibbs's loans. By the time of the Gibbs counts in question here, the material omissions, there had been several years of fraudulent loans propping up Mr. Gibbs. In those Criticized Asset Action Plans, there was testimony both from Brad Calloway, who was Mr. Gibbs's loan officer, and Bill Burnell, who was the chief credit officer, each of whom co-signed that document with Mr. Ryan, that it was both false and misleading. They explain how they used that document to trick the Board into thinking that Mr. Gibbs had the collateral to pay his loans and that he was cash flowing, when the truth was that Mr. Gibbs could not pay his loans, and the only reason he wasn't in default is because they kept giving him new loans. The jury was correctly instructed as to those material omission counts as well. In introducing those counts, the district court again said that it was the crime of making false entries, knowing they were false. And it wasn't just the jury, I'm sorry, it wasn't just the district court who gave the correct instruction. If your honors would look back at the record at page 10670, in the government's closing argument, we listed several of the lies in each of those Criticized Asset Action Plans that gave context to the material omissions. So if this court one day has to decide how Thompson affects 1005 and where the line is about material omissions, that will likely be a different case, because here there was overwhelming evidence in the five-week trial of falsity. What was the difference, this is all sort of blurred, I read as much of it as I could beforehand, but it's a lot, with the charges with Mr. Beebe, who was acquitted, and the charges with Mr. Brown. Was there an overlap, if any, on those, or was it that Mr. Beebe was not as intricately involved, I mean obviously he wasn't head of the bank, he was trying to follow in a chart sort of how this, there were a lot of players, including the ones who pled, but the jury acquitted him. Was there any overlap on any of his counts with Mr. Ryan? Yes, your honor. Mr. Beebe played a role in a single portion of the broader conspiracy with Mr. Ryan. One part of Mr. Ryan's self-dealing was using bank funds to support his own project called Wadsworth on the north shore of Lake Pontchartrain. Mr. Tremay was Ashton Ryan's partner in that deal, and in order to create the false appearance of recusal, Mr. Ryan had Fred Beebe act as the loan officer on paper with Warren Tremay. However, several witnesses, including Mr. Tremay, but also Bill Burnell, who stood in Mr. Ryan's shoes for those loans, testified that the recusal was only on paper, and the jury saw emails and other calendar entries showing that meetings about the Tremay loans happened in Ashton Ryan's office. They saw emails where people would say, I want to know, I wonder if Ashton Ryan knows about this one, because they had to confer with him. And both Mr. Dunlap and his partner, Mr. Davis, who were the contractors on the Wadsworth project, said at one point that Fred Beebe explained his role to them as keeping Ashton at arm's length, meaning keeping the appearance that Ashton Ryan wasn't in the loans, even though Mr. Ryan was at that meeting. All right, help me with it. Well, you won't forget your point, but I'll forget mine, so let me hear it. All right, there were instances in which there were tape recordings, albeit, I guess, conversations that Mr. Ryan didn't know he was being recorded. Some of those recordings were used, so help me understand the essence of the recordings vis-a-vis the theory of the case. Yes, Your Honor, and before we move on from Mr. Tremay, the answer was count 32 was one where Mr. Ryan was charged for a Fred Beebe loan, and Mr. Ryan was convicted for his role. But moving to the recordings Your Honor asked about, there were several, and it is not correct what Mr. Ryan's counsel said here, that everything was available to the bank. Some of the recordings that were played at trial were bank recordings. It was audio recordings of the full board of directors or the board loan committee, where the jury got to hear what Ashton Ryan and his co-conspirators said when they were But the jury was also able to hear private conversations outside of the presence of the board. The most notable one is the Kenneth Charity audio recording. This was Government Exhibit 200.001. It's a two-hour call, so I'm not going to try to summarize it, but many of the relevant excerpts are on pages 28 to 29 and 66 to 67 of the brief, and in that conversation Mr. Ryan and Mr. Charity give a pretty unvarnished explanation of their scheme. In that frank conversation Mr. Ryan admits that Kenneth Charity was getting loan proceeds for his projects, but he was spending them all on personal things. Mr. Ryan admits that he knew that the whole time because he was personally doing Kenneth Charity's books, and he even admits that they falsified tax returns. In part of that recorded call, Kenneth Charity was asking Mr. Ryan where his tax returns were, and Ashton Ryan said, I never filed your tax returns. Kenneth Charity responded, why were you doing my tax returns for past years? And Ashton Ryan responded, I just needed to fill those out because the board kept asking for them. Essentially admitting that Ashton Ryan hand-wrote tax returns for Kenneth Charity, provided them to the board of directors as if they were Charity's own tax returns when those weren't even filed with the IRS. Certainly information like that was hidden from the board of directors. They did not know that Ashton Ryan was ghostwriting one of his borrower's tax returns solely for the purpose of making him look credit worthy. There was also an audio recording of Mr. Ryan speaking to Mr. Vera. He was the one borrower who was actually wealthy, and in that recording, Mr. Ryan agreed with Mr. Vera that they had previously decided not to disclose to the board that Mr. Vera was lending money to Ashton Ryan. That is just one of many examples of Mr. Ryan benefiting personally, but it echoes the broader scheme, which is that the conspirators would say one thing amongst themselves and something very different to the board of directors. Unless the court has any other questions about the evidence or the issues Mr. Ryan raised here, we rest on our briefs and the very lengthy record of this five-week trial and the accompanying litigation. We ask that the court affirm. All right. Thank you, sir. Mr. Custain. Your Honors, I did not get last time to the privilege violation. It's all in my briefs, so I will not go through it here, but the fact that the government brought up the Jeff Dunlap relationship is very important, and he's using Jeff Dunlap as such an important witness, which I guess he was, but the court must recall that because of the botched Google search, which was a complete violation of your authority in Harbor, the district court's authority in Ingram and the Hebe cases, this memo about Jeff Dunlap, which was from Mr. Ashton Ryan to me, handwritten, ended up on the government's desk, and two of the prosecution team read it while it was on relativity. That was admitted at the evidentiary hearing, so all the information that Ashton Ryan gave me as to his defenses regarding Mr. Dunlap and Warren Tremay in this memo went to the government before the indictment. Fifty days later, they went and started interviewing witnesses, including Mr. Tremay and Greg St. Angelo, so that's why . . . Was that as part of a motion to quash the indictment? It was. It was a motion to dismiss the indictment. We had an evidentiary hearing. It was a combination motion to suppress and motion to dismiss. Judge Fallon granted the motion to suppress, which meant that this memo and the other memos that were seized in the Google search, which were violations of privilege, could not be introduced at trial, but he didn't order them returned, as Harbor said you must do. Okay. He granted you relief on them. They weren't used in the trial, so they weren't part of what the jury had. Is that right? That's correct. But it was used for informational purposes, an investigation, and they knew the relationship between Ashton Ryan and me . . . Were you reprising your motion to dismiss the indictment? Is that what you're urging? That's in my brief. It's one of the grounds in the brief. I read your brief more than once. It's a lot in there. I'm just trying to center . . . That is a ground for the appeal. I'm just trying to center the argument you made. You're up on rebuttal, and you started with an item that you chose to calibrate your time and not argue the privilege. So you're on rebuttal, arguing the privilege, and you've got two and a half minutes left. I'm just trying to understand where it fits within the scheme of the argument. That's all. Because the government brought up Jeffrey Dunlap so prominently, and what I'm telling the court is that they got a . . . and Warren Tremé, which are both the subject of a violation of attorney-client privilege. That's why I brought it up. All right. And . . . You haven't waived anything that you've waived, and you . . . Thank you. . . . you know that. Everything that's in the brief . . . Well, then, I'll say in my last less than two minutes, when Mr. Moses said that the case was not decided under right-to-control theory, he doesn't know that any more than you all know it or I know it. Because the jury was not instructed that they could not use that as a ground. And because . . . Did you propound a tailored instruction or charge to the jury? I know you objected to what he used, which was the patent, but is there a specimen charge? I did not. All right. And that's the first thing I look for when somebody argues about what was given. Trial judges, it's hard for a judge to go wrong if they use a Fifth Circuit patent. It's not impossible, but it's hard. But I did not see . . . Correct. Listen to me. I did not see a tailored jury charge for Judge Fallon to use consistent with what you're urging, and that's what I'm asking. It's one thing to say what he did was wrong, but it's another to say you had a charge . . . Did not. . . . that was used in some other case, etc., etc., that was right as rain. He didn't give it. Therefore, reverse my case. We don't have that here. That's correct. Your complaint is about the patent charge that was used vis-à-vis your arguments about the indictment, right? That is correct. I just want to make sure I'm clear on what you're arguing. Right. And that's correct. We did not give a patent instruction on that, and neither did Mr. Thompson. He had a patent . . . Mr. Thompson did as well. He had a patent instruction under 1005, and that got reversed. And we had the same 1005. So the fact that I did not submit one, I didn't have a crystal ball to know what Simonelli was going to do, that's . . . So we don't know. It was a general verdict. No one knows, and they could easily have been misled because I believe . . . You're speculating. You know, this trial took weeks. I read a whole lot of this stuff just because it was interesting. Of all the . . . Your client was on the stand forever. The government had all these exhibits there. You cross-examined the pepper job on all of that stuff that was in there. So you haven't argued sufficiency in any of your arguments. We got your first argument, and now I understand, at least me, where the privilege part . . . So where you're ending up is basically . . . I didn't get there, Judge. So I didn't get there, but it's in the brief, both briefs. But because I think it was Judge Romero said because that statute is in the disjunctive that you could have intangible rights, and that's exactly what the Supreme Court said, you can't do that. Intangible rights are not subject to property. And I think it's speculation, Your Honor. I'm speculating, saying we just don't know what the jury did. It's speculation. What the government said, the jury did not use that as a ground. He doesn't know that. You haven't said one word about what the jury did know about the tape recordings. You're on rebuttal. You haven't said anything about what they heard. You're saying we don't know what the jury thought, but you haven't said how the jury couldn't have reasoned from the evidence. It's extensively in my brief that in the tape recording with him and Mr. Vera, he told Mr. Vera five times, don't lie to the FBI and get a lawyer and a CPA and straighten this out. And that's what he said. That's in the recording. And the government didn't put that in evidence. I did. I played that ad nauseum for the jury, that very long tape where Ashton Ryan is speaking with Mr. Vera, correcting him on misconceptions, and the government is the one that set that tape up. But I played it. And so it was very exculpatory. All right. Thank you, sir. I'm afraid your time is up. Thank you, Your Honor. All right.